Filed 6/17/21  P. v. Hernandez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PATRICIO HERNANDEZ,<br><br>    Defendant and Appellant. | F077991<br><br>(Super. Ct. No. BF171912A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Jacquelyn Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Tracy Yao, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Patricio Hernandez stands convicted of elder abuse (Pen. Code, § 368, subd. (b)(1); count 1);[1] assault likely to produce great bodily injury (GBI) (§ 245, subd. (a)(4); count 2); and battery resulting in serious bodily injury to the victim (§ 243, subd. (d)). The jury also found true enhancement allegations as to counts 1 and 2 that defendant personally caused the victim GBI pursuant to section 12022.7, subdivision (a) (section 12022.7(a) or § 12022.7(a)). In a bifurcated proceeding, the court found true defendant had suffered a prior prison term within the meaning of section 667.5, subdivision (b) (section 667.5(b) or § 667.5(b)).

Defendant was sentenced to the upper term (four years) for elder abuse (§ 368, subd. (b)(1)), three years for the GBI enhancement under section 12022.7(a), and one year for the prior prison term enhancement under section 667.5(b). On count 2, the court imposed the upper term of four years, with a three-year term for the GBI enhancement. On count 3, the court imposed the upper term of four years. The court stayed execution of the sentences imposed on counts 2 and 3 pursuant to section 654.

For the reasons stated below, the prior prison term enhancement under section 667.5(b) is stricken pursuant to Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill No. 136 or Sen. Bill No. 136). We order a limited remand so defendant may develop a record, pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), regarding his ability to pay the fines and fees assessed by the trial court. In all other respects, the judgment is affirmed.

# FACTUAL SUMMARY

On the evening of April 10, 2018, Maria C. received a call from her sister's son, defendant, who told her that he had just "beat the fuck" out of Maria's brother, David, who was living with defendant's mother, Ophelia. Maria went to Ophelia's house to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

check on David. When she arrived, defendant was standing in the driveway, Ophelia was there, and David was in his bedroom. When Maria saw David in his bedroom, she noticed his injuries—both eyes were closed shut, he had a broken lip, and blood was coming out of his mouth. His shirt was dirty with blood and mud. Maria called 911 from the driveway; Ophelia was sitting in a lawn chair looking distraught.

Maria told the 911 dispatcher defendant was still at the scene, although defendant had instructed her to say he was not there. Defendant told Maria that David had been insulting and nasty, would not leave defendant alone, and said defendant's kids were lowlifes and drug addicts. Maria testified David regularly drank—when David had lived with her in the past, he would drink almost every day. She testified he was a belligerent drunk who likes to fight. When intoxicated, she had seen David fall and sustain injuries.

Officer Moore was dispatched to Ophelia's house, where he found David unable to move his jaw and making a moaning sound when talking. Defendant was not at the scene. In a five-minute interview, David told Moore defendant had struck him in the face with a closed fist three or four times; David fell to the ground and defendant kicked him about six times in the head. While David was in the ambulance, Moore saw him vomit blood.

David was taken to the hospital in an ambulance. At the hospital it was determined David had suffered a cheekbone fracture, a brain bleed, and a procedure was done to alleviate the pressure behind one of his eyes. A treating physician testified David's injuries were consistent with blunt force trauma, and the cheekbone fracture would have been caused by some kind of high force. David denied any loss of consciousness and he denied any alcohol use. Patient records indicated David reported daily drinking.

David testified he had tried to retrieve his saw from the storage trailer on the morning of April 10, 2018, which he could not locate. He asked defendant and Ophelia if either of them had seen it—neither of them could locate the saw. David then went back

3.

to his bedroom. Later in the afternoon, after he had about three beers, he went back outside and confronted defendant about the saw. At that point, defendant hit him. David had not tried to hit him first. Defendant was hit twice in the ribs, and defendant kicked his head. Defendant sprayed him with the hose, and David began slipping and sliding on the grass. Defendant took the phone away from David, and then continued hitting and kicking him in the same places. David could not recall if he ever got back up. Later he heard Maria talking to him; he was unaware of what Maria did or whether defendant left the scene. The police came, but he did not remember speaking to officers. He was taken to the hospital, where his injuries were treated.

While David was transported to the hospital, Officer Moore stayed at Ophelia's house to interview witnesses. Maria told him that when she arrived at the house, David had been lying on his back in the rear yard and defendant had sprayed him with a hose. She said defendant told her he beat the "shit" out of her brother.

Moore was able to speak to David again at the hospital; David told Moore he had been arguing with defendant, David had slipped to the ground and defendant had kicked him in the face five or six times. When defendant was arrested, he told Moore and Officer Barrier that there were other witnesses who saw what happened—neighbors of Ophelia—but the officers were unable to contact them; they made a single attempt to contact these witnesses around 5:00 a.m. the morning after they arrested defendant.

Ophelia testified for the defense. On the day of the incident, she testified both David and defendant were living with her. She saw David drink daily while he lived with her, and she has seen him fall twice in the past when drunk, but he was not injured on either occasion. On the morning of the incident, David was looking for a saw, and around 10:00 a.m. she and defendant started looking for it on the property. She thought David started drinking around 11:00 a.m. The search lasted until about 5:45 p.m., when Ophelia left—they never found the saw. Defendant was in the backyard when she left and David, who was then uninjured, was in his room.

4.

Ophelia returned to the house around 9:00 p.m., and found defendant outside the gate with one of the neighbors; she went into the house and saw David, who appeared injured. Ophelia saw blood in the bathtub, and some blood smeared on the fridge, which had not been there when she left. Some flower pots in the back of the house were knocked over. After the incident, David went to live with another sister and Ophelia had not spoken to either of them since then. The situation had caused a family divide.

Defendant testified he had seen David drinking frequently while they were all living at Ophelia's house, and had seen him fall as a result of intoxication both inside and outside the house on other occasions, but he had never injured himself before. On the morning of the incident, David confronted defendant about a missing saw—David had an attitude and appeared angry. When defendant told David he had not seen the saw, David walked away. Defendant and Ophelia looked for the saw in the trailer shed, which they emptied out completely, but they never found the saw. The search ended around 3:00 p.m. David never came out to help them look for it; instead, he would come out of the house intermittently with a beer can in his hand.

After Ophelia left, David came out of the house and confronted defendant again about the saw. His tone was aggravated and he appeared angry; he began yelling and took a swing at defendant, which did not make contact. Defendant then hit David in the face; David fell, stood up, took another swing at defendant, and defendant hit him a second time in the face. David stumbled and hit the front of his head on the patio. David then followed defendant to a peach tree, where David fell face forward into the tree. David next fell backwards onto a flower pot, and then hit a truck with his head and his face. During this time, defendant described David falling and getting back up numerous times. At some point, defendant sprayed David with a hose to try to "sober him up."

David told defendant he wanted to take a shower, but defendant kept telling him to sit down. He helped David to the rail of the steps in the backyard, then defendant went to the front of the yard. However, David tripped on the steps, fell, and hit his head again.

5.

Defendant helped David to the bathroom, turned on the water for him, and closed the door and walked away. Defendant tried to call Ophelia, but he could not reach her; then he called Maria. He denied telling Maria he beat the "fuck" out of David. He told Maria that David was all over the place drunk again. The neighbor was with defendant while all of this happened; one of the neighbors arrived when the altercation started in the backyard—she got there right before David tripped into the peach tree. She too was trying to get David to sit down.

Defendant denied ever kicking David or stomping on him while he was on the ground. He did not remember telling Maria not to tell the 911 dispatcher the person who did this was nearby. His voice on the 911 recording can be heard saying, "'No, and tell them no.'" He explained he was responding to questions Maria had asked before—he was not prompting her to respond to the dispatcher's question whether the perpetrator was still nearby. He thought perhaps they were asking whether the victim was nearby. He denied he told officers he was not present for the 911 call.

Defendant left the scene before police arrived because he had a misdemeanor warrant, and he did not feel like going to jail with no money. Defendant admitted having steel-toed boots on, but testified they no longer had much steel in them—it had come out over time and with repeated washing, although there were probably some pieces still in them. Defendant testified that while David was intoxicated when he confronted defendant, David was still capable of causing injuries. He admitted he told officers David's falling in the yard was almost comical, but that it had become serious when David hit himself really hard. He denied remembering he told the officers he had not called 911 for David because David was being a "prick." Defendant was extensively cross-examined about his prior offenses, which included domestic violence convictions.

The prosecution called Officer Barrier as a rebuttal witness. He testified about what defendant told officers when he was interviewed upon arrest. In defendant's initial version of what happened, David was intoxicated and falling down every few steps. But

6.

as they questioned him about the age and capabilities of David and why defendant would punch a man who was so inebriated, defendant changed his story to say the victim was like a 30-year-old, strong, capable military man.

As for the shoes he was wearing during the altercation, defendant first said they were steel-toed boots, but later he called them shoes and explained some of the steel had come out of them; still later he said there was no steel in the shoes at all.  Defendant described the scene in the backyard at Ophelia's house as covered with blood.  He first described his initial punch of David as a "good one," but later said he did not hit David so hard.  Defendant talked about the neighbors, but changed his story about how close his relationship was with them.

Barrier testified he and Moore attempted to contact these neighbors, but were unable to do so.  Defendant told them his shoes were in the laundry room of Ophelia's house, but the officers were unable to get into the residence to get them.  Barrier conceded they had not contacted Ophelia to obtain the boots, but had called David's other sister, Lucy, with whom he was staying after the altercation.

The jury returned a verdict of guilty on all counts, and they found true two special allegations that defendant had caused the victim GBI under section 12022.7(a).  During a bifurcated proceeding, the court determined defendant had suffered a prior prison term within the meaning of section 667.5(b).  Defendant was sentenced to the upper term of four years for elder abuse under section 368, subdivision (b)(1), three years for the GBI enhancement under section 12022.7(a), and one year for the prior prison term under section 667.5(b).

## DISCUSSION

### I.     *Miranda* **Claim**

Defendant argues he was subjected to unwarned interrogation at the time of his arrest in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  According to defendant, when a *Miranda* warning was provided, it was administered mid-

interrogation—deliberately timed to render the warning ineffective as prohibited under *Missouri v. Seibert* (2004) 542 U.S. 600, 604, 617 (plur. opn. of Souter, J.) (*Seibert*). For these reasons, defendant maintains the trial court erred in ruling admissible any of the pre- or postwarning interrogation statements.

The People contend neither the officer's statement at the time of arrest nor any direct questions posed to defendant prior to a *Miranda* warning constituted interrogation or the functional equivalent. Assuming there was any error in admitting the prewarning statements, the People argue it was harmless. The People maintain defendant's assertion under *Seibert* as to the admissibility of the postwarning statements was forfeited.

## A.    Background

Defendant filed a motion in limine to exclude his statements to police under *Miranda*, and Officers Moore and Barrier testified at a pretrial suppression hearing.

Officers Moore and Barrier arrested defendant at his son's home the day after the incident; Barrier took defendant into custody inside the home, placed him in handcuffs, and Moore and Barrier walked defendant out to the patrol car. Moore testified defendant was asking why he was arrested and what was going on. Defendant was placed into the back of the patrol car and was advised the victim was in the hospital and badly injured. Moore then started his recorder almost immediately after defendant was placed in the vehicle. A *Miranda* warning was given about 13 minutes after the recording started.

Barrier testified when they took defendant into custody, they told him they were arresting him for elder abuse—Barrier was unsure whether defendant had asked why he was being arrested; defendant then began "rambling" about the incident with David. He told them about David's drinking habits, how violent he is, that David was former military and tried to assault defendant, but ended up falling multiple times and hitting his head repeatedly. It took approximately one minute to handcuff defendant and walk him back to the car, and Barrier could not say exactly when defendant made these statements between the house and the patrol car. The only questions the officers asked at this point

8.

were clarifying questions about the information defendant was giving them. Barrier testified he may have asked about who Audrey T. was or what portion of the house defendant wanted him to look at, but Barrier did not specify whether these were questions during the recorded portion of the interview or in the unrecorded minutes before they reached the patrol car. Barrier testified he felt defendant was offering spontaneous and voluntary statements about the investigation—Barrier did not want to interrupt defendant with a *Miranda* warning while he was volunteering pertinent and unsolicited information.

After Barrier's initial unrecorded statement to defendant that the victim was badly injured, the recorder was turned on in the car and there were explicit questions asked by Barrier. Barrier testified the conversation just prior to the audio recording involved defendant's statement that the victim was not in the hospital anymore. Barrier restated this information in the form of a question, "***He's not in the hospital no more***?" Barrier then asked, "***How do you know that***?" (Boldface added.) Defendant responded that he had called and talked to his family. Barrier responded, "Oh."

Defendant then started a discussion about what had happened:

> "[DEFENDANT]: Only reason I didn't stay right there cause my neighbor came out there and got me away its cause he was polluted and drunk and he came at me. He called my son a crack head and he swung at me, and I hit him once, I actually hit him twice. But he kept falling down all over the yard he couldn't even stand up he was so polluted (fluid?). He was beating himself up, he knocked over my mom's flower vase case and everything, I didn't do all that to him [Unintelligible] I didn't even have to walk away to leave him there…the neighbors told me to stay over there [Unintelligible] but I just didn't want to stay cause I had a warrant.

> "[BARRIER]: ***Ok so you're saying there's people that saw it***?

> "[DEFENDANT]: Yeah, my neighbors. I went over there. I stayed over there. I didn't stay with that guy… [⟨P⟩] …[⟨P⟩] … Ya I just hit him twice and that was self-defense when he hit me. He missed. He kept just falling and falling and falling. And my mom knows it. I'm sure they'll come to court and vouch for that [Unintelligible]. All the sisters were there. I was talking to them. [Unintelligible] I went to my neighbors to stay away from this guy. He would not stop and get off of me he just got so drunk.

9.

"[BARRIER]: What neighbor should we go talk to, to get your side of this?

"[DEFENDANT]: Audrey [T.].

"[BARRIER]: Ok.

"[DEFENDANT]: Yeah, I went over there. I stayed over there. And them, um, [t]hen I went and waited for my mom to come back.…" (Boldface added.)

During the drive to the police station, defendant and Barrier also had the following conversation:

"[BARRIER]: Your son looks a lot like you just a little bit taller huh?

"[DEFENDANT]: Ya he's way bigger like 6'4. 6'5.

"[BARRIER]: Yeah. He's a big ol' boy.

"[Cross Talk] [Unintelligible]

"[DEFENDANT]: This guy, [h]e's known to get drunk and fall down like that …

"[Unintelligible]

"[BARRIER]: Who's that?

"[DEFENDANT]: My uncle. Crashes his motorcycle. [Unintelligible] He's … an alcoholic. He drinks like that every day. And he gets a smart mouth on him all this time I've been dealing with it and the only reason I stayed there is because I have that class [Unintelligible]. But he was falling down [Unintelligible]. I was just trying to help him up. [Unintelligible]. Hit his face here. [Unintelligible] He's already home. My brother was there. [Unintelligible]

"[BARRIER]: Your brother called you?

"[DEFENDANT]: Yeah.

"[BARRIER]: Ok."

10.

The police vehicle stopped at the police station at this point in the recording. Defendant was taken inside the station where he was given a *Miranda* warning. He indicated he understood his rights, and said he was willing to talk with the officers. Defendant was then questioned extensively for approximately 45 minutes.

The court ruled the prewarning questions officers asked defendant at the time of his arrest were minor, clarifying questions that were not designed to elicit incriminating responses.

**B.      Standard of Review**

"In reviewing the trial court's ruling on a claimed *Miranda* violation, '"we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained."'" (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.) Further, "[we] apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

**C.      No Interrogation or Functional Equivalent Before *Miranda* Warning**

The rule of *Miranda* requires that before police may question a suspect during a custodial interrogation, the suspect must be advised of the right to remain silent and to an attorney and that any statements may be used against him or her in court. (*Miranda*, *supra*, 384 U.S. at p. 479; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297 (*Innis*).)

The defendant in *Innis* was arrested for robbery with a sawed-off shotgun; when arrested, however, defendant was unarmed. While transporting the defendant to the police station, two officers conversed among themselves about the missing gun. One officer said to the other that "'there's a lot of handicapped children running around this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.'" (*Innis*, *supra*, 446 U.S. at pp. 294–295.) The defendant interrupted and told them he would take them to the gun, which was recovered. The court concluded this

11.

was nothing more than a dialogue between two officers, no response was invited, it was not a lengthy harangue of the defendant nor particularly evocative, and there was no evidence the officers were aware the defendant was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children—it was not interrogation. (*Id.* at pp. 302–303)

In reaching this conclusion, the high court "defined the term 'interrogation,' stating that 'the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.  A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.'  (*Innis*, [*supra*,] 446 U.S. at pp. 300–302, fns. omitted.)"  (*People v. Haley* (2004) 34 Cal.4th 283, 300 (*Haley*).)

### 1.    Officer's Statement About the Victim's Status

Officer Moore testified that as soon as defendant was handcuffed, he asked why he was being arrested; when they informed defendant of the basis for his arrest, they told him David was in the hospital and "injured pretty bad," and defendant started giving an explanation about what happened.  Defendant argues his explanation to officers was

12.

provoked by their statements about the reason for his arrest and that David was badly injured—the statement was an accusation the officers reasonably should have known was likely to elicit an incriminating response. According to defendant, although not a direct question, this was the functional equivalent of interrogation.

Under *Innis*, not all conversation between an officer and a suspect constitutes interrogation. (*Innis*, *supra*, 446 U.S. at pp. 301–302.) The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response. (*Id.* at p. 301.) While context will make all the difference, generally police statements to suspects that are customarily attendant to arrest and custody—such as the basis for the arrest or a statement about the evidence against the suspect—are not the functional equivalent of interrogation.[2]

For example, in *Haley*, the defendant was interviewed at the police station about a victim's (Clement) murder, but he denied any involvement. (*Haley*, *supra*, 34 Cal.4th at p. 296.) A few days later, fingerprints obtained at Clement's residence were matched to the defendant and he was arrested. (*Ibid.*) The defendant was placed in a patrol car and advised he was under arrest for Clement's murder; a detective then told the defendant they knew he had committed the murder because his fingerprints were found at the crime scene. The defendant replied, "'You're right. I did it.'" (*Ibid.*, fn. omitted.)

On appeal, the defendant argued his statement in the patrol car was obtained in violation of *Miranda* because the detective's statement that he knew the defendant committed the murder because of the fingerprint at the crime scene constituted interrogation as it was reasonably likely to elicit an incriminating response. (*Haley*, *supra*, 34 Cal.4th at p. 300.) The court rejected this argument because the detective's statement was not phrased as a question, and it did not call for an incriminating response.

---

[2] See *United States v. Payne* (4th Cir. 1992) 954 F.2d 199, 203 ("whether descriptions of incriminating evidence constitute the functional equivalent of interrogation will depend on circumstances that are too numerous to catalogue") (*Payne*).

The court concluded "[a] brief statement informing an in-custody defendant about the evidence that is against him is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response." (*Id.* at p. 302.)

Similarly, in *People v. Huggins* (2006) 38 Cal.4th 175 (*Huggins*), the defendant was in a police interview room after being taken into custody. (*Id.* at p. 197.) Two officers were plugging in a tape recorder to begin the formal interview and told the defendant he was a suspect in the murder they were investigating. (*Ibid.*) The defendant then spontaneously admitted escaping from California Youth Authority work detail, but denied contact with the victim; he requested a lawyer and the formal interview never occurred. (*Ibid.*) On appeal, the defendant argued this spontaneous statement was admitted in violation of *Miranda.* The court rejected the argument, concluding that telling the defendant he was a murder suspect did not call on him to confess—and he did not—he denied any involvement in the victim's death. (*Huggins*, *supra*, at p. 199; see *Payne*, *supra*, 954 F.2d at pp. 202–203 [information given to a suspect about charges or evidence does not necessarily constitute interrogation—that information could contribute to the intelligent exercise of judgment when considering what course of conduct to follow—it was not reasonably designed to elicit an incriminating response]; *Easley v. Frey* (7th Cir. 2006) 433 F.3d 969, 971, 973–974 [after suspect invoked his rights, officer gave information about the evidence against him and that if convicted, he could face the death penalty—held not to be interrogation].)

But when an officer's discussion of the charges or evidence against a suspect amounts to "compelling influences, psychological ploys, or direct questioning" (*Arizona v. Mauro* (1987) 481 U.S. 520, 529), it will likely constitute interrogation. Thus, in *People v. Sims* (1993) 5 Cal.4th 405 (*Sims*), the court concluded an officer's discussion of the evidence against the defendant after he invoked his rights was interrogation. (*Id.* at p. 441.) Specifically, the suspect invoked his rights at the outset of a police interview, and the interviewing officers got up to leave; the defendant then asked what would

14.

happen next, referring to extradition. (*Id.* at pp. 437–438.) An officer explained extradition proceedings would begin, and then gratuitously added he was present at the motel room where the murder victim was found and had reason to believe the defendant had occupied that room prior to the killing. The officer went on to tell the defendant the murder victim had delivered a pizza to that room. The defendant responded he "'had to kill that boy.'" (*Id.* at p. 438.) The officer then described the crime scene, the condition of the victim, and noted the victim did not have to die in that manner and could have been left there alive. The defendant responded the victim would have identified him, among several other comments. On appeal, our high court held the officer's statements could not have been understood as simply informing the defendant of the charges against him or the next step in the extradition proceedings—it was interrogation that violated defendant's invoked *Miranda* rights. The reply to the defendant's question was nonresponsive and served no legitimate purpose incident to the defendant's arrest or custody. Rather, it amounted to the application of a "'technique of persuasion'" that was likely to induce the defendant to defend, and thus incriminate, himself. (*Sims*, *supra*, at pp. 443–444.)

In *People v. Davis* (2005) 36 Cal.4th 510 (*Davis*), the defendant was taken to a police station and advised of his rights, which he refused to waive. (*Id.* at p. 552.) He was then placed in a holding cell next to codefendants while police recorded their conversation. (*Ibid.*) While recording, a detective entered the cell area and looked directly at the defendant and asked him if he remembered the gun, to which the defendant responded, "'Yeah.'" (*Id.* at p. 553.) The detective then said, "'Think about that little fingerprint on it we'll see ya ….'" (*Ibid.*) Although ultimately concluding admission of the defendant's acknowledgment he "'remember[ed]'" the gun was harmless, the court nonetheless held the detective's question constituted interrogation because, not only was it a direct question, it called for an incriminating response because it would imply the defendant knew the gun was used in the murder. (*Id.* at p. 555.)

The context here is similar to *Huggins* and *Haley* and distinguishable from *Sims* and *Davis.* Unlike here, in *Davis* and *Sims*, the officers' statements were made well after arrest—the suspect in each case had already been read their rights, had invoked, and were in a holding cell and an interview room, respectively. The officer's statement in *Sims* was not responsive to the question the defendant asked and gratuitously delved into the facts of the case for no reason other than as a ploy to draw the defendant into making an incriminating statement. The officer's statement in *Davis* was a direct question that was clearly meant to elicit an incriminating response following the defendant's invocation— which it did.

Barrier's statement about the victim being badly injured was made at the time of arrest while explaining the charges against defendant. And, even though defendant argues the statement was accusatory, any accusation was mild at most and did not approach the type of accusation the detective in *Haley* made by telling the defendant they knew he was the murderer because they found his fingerprints at the murder scene. As noted in *Payne*, rather than calling for an incriminating response, information relayed to suspects about the basis for their arrest or the evidence against them at the time of arrest may actually assist suspects in the exercise of judgment and selecting a course of conduct about what to say. (*Payne*, *supra*, 954 F.2d at p. 202.) Such information is just as likely to evoke a denial, like in *Huggins*, as a confession or inculpatory statement. Under the circumstances here, informing defendant at the time of arrest the victim was badly injured did not amount to an accusatory ploy constituting the functional equivalent of interrogation.

### 2. Officer's Direct Prewarning Questions Not Interrogation

The direct questions Barrier asked defendant prior to the *Miranda* advisement did not constitute interrogation either. The trial court found these questions were merely clarifying questions asked after defendant volunteered unsolicited statements about the incident. We agree.

"Just as custodial interrogation can occur in the absence of express questioning [citation], not all questioning of a person in custody constitutes interrogation under *Miranda*." (*People v. Ray* (1996) 13 Cal.4th 313, 338 (*Ray*).) In *Ray,* the court held that unwarned clarifying questions asked of a voluntarily confessing prisoner did not constitute interrogation. (*Id.* at pp. 333–334, 338.) In that case, the prisoner (Ray) invited law enforcement to discuss a series of unsolved crimes to which he wished to confess. (*Id.* at pp. 333–334.) An investigator interviewed Ray at the prison and, although he did not provide an express *Miranda* warning to Ray, he informed Ray he would pass any incriminating information to the state police. (*Ray*, *supra*, at p. 334.) During the defendant's narrative and detailed account of his crimes, the investigator asked clarifying questions that were largely limited to dates and locations of the crimes and the status of the victim after the crime. (*Id.* at p. 334 & fn. 9.)

In rejecting Ray's subsequent claim the interview violated *Miranda*, the court reasoned the investigator did not influence the way Ray reported the crimes; the entire confession was given in a narrative, almost rambling form; to the extent the investigator asked questions, they were neutral inquires made for the purpose of clarifying statements he did not understand. (*Ray*, *supra*, 13 Cal.4th at p. 338.) "Nothing in the substance or tone of such inquiries was reasonably likely to elicit information that defendant did not otherwise intend to freely provide." (*Ibid.*)

In *People v. Gamache* (2010) 48 Cal.4th 347 (*Gamache*), a booking deputy asked the defendant about his military past. (*Id.* at p. 384.) The defendant talked about his military past, but also volunteered information about the crimes for which he was arrested, saying, "'I fucked up. I knew better. I should have used a .45.'" (*Ibid.*) The deputy then asked the defendant what had happened, how the defendant felt, and about one of the victims. (*Ibid*.) The defendant responded to each question with incriminating statements. (*Ibid.*)

17.

On appeal, the California Supreme Court noted "the police 'may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.'" (*Gamache*, *supra*, 48 Cal.4th at p. 388, quoting *People v. Clark* (1993) 5 Cal.4th 950, 985.) The court held the statements the defendant made to the deputy were not "the product of interrogation" because even though the questions related to the crimes for which the defendant was arrested, they were """"neutral inquir[ies]"" [that] did not convert [the defendant]'s volunteered admissions into the product of interrogation." (*Gamache*, *supra*, at p. 388, quoting *Ray*, *supra*, 13 Cal.4th at p. 338.)

In *People v. Franzen* (2012) 210 Cal.App.4th 1193 (*Franzen*), the court determined a neutral question an officer asked the suspect did not constitute interrogation. There, an in-custody suspect was being asked booking questions when her phone began to ring. (*Id.* at p. 1199.) The officer told her she could get the phone after his questioning was done, and she said, "'[i]t's probably the guy looking for his money.'" (*Ibid.*) The officer responded, "'What guy?'" She replied, "'The guy that gave my friend the drugs to sell, I guess.'" (*Ibid.*) On appeal, the court concluded the officer's question was merely a natural conversational response to the defendant's own statement, which, in form and content, invited the hearer to request clarification.

Considering the circumstances here established by the officers' testimony and the recorded interview, it was defendant who freely began volunteering information about the incident. Barrier and Moore testified that defendant started talking about the incident immediately upon his arrest. As discussed above, the officers did not elicit the statements defendant volunteered just because they placed him under arrest and told him why they did so. The very few prewarning questions asked during defendant's volunteered statements were neutral and clarifying questions that did not constitute interrogation similar to those in *Ray*, *Gamache*, and *Franzen*. After defendant was informed David was in the hospital and badly injured, defendant told them the victim was no longer in the

18.

hospital. Barrier repeated the information in the form of a question, "He's not in the hospital no more?" and then asked defendant how he knew that.

Barrier's first recorded question was asked to confirm whether he heard defendant correctly—it was not eliciting any new or additional information, it was merely confirming what defendant had said. As for the second question, nothing reflects the officers knew David was out of the hospital or that defendant's knowledge of the victim's status, or how he knew it, was material in any way; the question was neutral. Similar to *Franzen*, defendant's statement also implicitly invited Barrier to ask how defendant knew that information since defendant was contradicting what they had just told him. (See *Franzen*, *supra*, 210 Cal.App.4th at p. 1199.)

Barrier's next question was again limited to clarifying whether he correctly understood one of defendant's statements. Defendant said "the neighbors told [him] to stay over there," but that he did not want to because he "had a warrant." At this point, Barrier asked, "Ok so you're saying there's people that saw it?" Like the first question about the hospital, it was merely a question to confirm what defendant had said—it was not seeking any information beyond what defendant had already freely provided, and it did not invite more than a yes or no response.

Defendant responded that his neighbors had seen the incident, and he "stayed over there." Defendant continued to volunteer information that the victim was intoxicated and became injured as a result, that defendant hit the victim twice in self-defense after the victim tried to hit defendant; that his mother's sisters were there; and that he "went to [his] neighbors to stay away from [the victim]. He would not stop and get off of me he just got so drunk." Barrier then asked, "What neighbor should we go to talk to, to get your side of this?" There is nothing in the record showing Barrier previously knew anything about which neighbor purportedly heard or saw the confrontation, and defendant had repeatedly noted the neighbors' involvement.

19.

Although defendant argues Barrier had to change the subject back to the neighbors to elicit this information, defendant had *just* said he went to the neighbors to get away from the victim—Barrier was not returning to a subject defendant had abandoned. Barrier's question was meant only to clarify the name of the neighbors defendant had already mentioned repeatedly. This is similar to the investigator in *Ray* who asked for dates and locations of the crimes Ray was telling the investigator about during an extended narrative. (*Ray*, *supra*, 13 Cal.4th at p. 334 & fn. 9 [no interrogation; questions were mostly limited to dates and locations of various crimes and the fate of the victims].) It is also similar to the booking detective in *Gamache* who asked followup questions when the defendant began volunteering information about the crime—those questions did not convert the volunteered admissions into the product of interrogation. (*Gamache*, *supra*, 48 Cal.4th at p. 388.)

Another question was asked when Barrier commented that defendant's son was a little bit taller than defendant. Defendant responded his son was 6 feet 4 or 5 inches tall and then turned the conversation back to David without any questions from the officers. Defendant said David was "already home. My brother was there." Barrier asked, "Your brother called you?" Again, given the circumstances, this was a clarifying question to confirm whether Barrier understood what defendant meant when he said the victim was "already home" and his "brother was there." The initial question about defendant's son was merely a rapport question analogous to the booking deputy asking the defendant in *Gamache* about his military experience. (*Gamache*, *supra*, 48 Cal.4th at p. 388 ["no reason to suspect that inquiry about Gamache's military experience would lead Gamache to volunteer his regret about failing to kill [the surviving victim] or the other inflammatory remarks that followed"].) Like *Gamache*, Barrier could not have reasonably known that question would lead defendant to volunteering more statements about David and the incident. The followup question about defendant's brother was simply to clarify what defendant was again freely volunteering.

Barrier testified he felt stopping defendant while he was voluntarily and spontaneously talking to give a *Miranda* warning would have hurt the investigation because he was giving them pertinent information. Moore described the prewarning questions as "investigative" and clarifying. Defendant argues the prosecutor and the trial court split hairs by trying to say that such investigatory questions were not designed to elicit incriminating responses.

The officers' terminology in characterizing their questions does not play a dispositive role in determining whether they constitute interrogation. Even listening entirely mutely to defendant would have been "investigatory" in some sense because it might turn out to be material information. It is the context here that is critical—defendant's decision to immediately begin volunteering information about the incident did not come at the behest of any question designed to elicit an incriminating response or the functional equivalent. The few prewarning questions Barrier asked were either neutral questions in response to what defendant had already freely and voluntarily elected to tell them or were meant to confirm the officers' understanding of what defendant had said, such as asking whether defendant was saying "there's people that saw it?" Just because the officers broadly characterized their questions as "investigatory" does not transform the questions into interrogation. (*Gamache*, *supra*, 48 Cal.4th at p. 388 [neutral inquiries do not convert volunteered admissions into the product of interrogation].)

Defendant argues the officers' admission they wanted information helpful to their investigation is a very reliable indicator their questions were asked to elicit an incriminating response. But, law enforcement professionals are always going to be interested in obtaining information useful to an investigation. Their ultimate desire for that information does not transform *any* question they ask into interrogation. Nor does it mean that when a suspect has freely decided to volunteer information—uninitiated by interrogation or its functional equivalent—that officers cannot pose *any* neutral,

21.

clarifying questions about those volunteered statements. *Gamache* and *Ray* hold just the opposite. (*Gamache*, *supra*, 48 Cal.4th at p. 388; *Ray*, *supra*, 13 Cal.4th at p. 338.)

Looking at the entire context and circumstances, defendant's initial decision to volunteer information about the incident did not stem from interrogative questions of the officers. The few prewarning questions asked about defendant's volunteered statements were posed to clarify or confirm, in very limited form, what defendant had *already* freely told them; the questions did not coax or encourage additional information defendant had not already offered; the questions did not invite a narrative response and could have been answered with only one or two words; and the questions did not utilize information the officers already knew in a ploy to draw out incriminating statements. The officers' neutral inquires in response to his volunteered statements did not convert those statements into the product of interrogation. (*Miranda*, *supra*, 384 U.S. at p. 478 ["Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."].)

No questions posed to defendant prior to the *Miranda* warning constituted interrogation. The officers' limited statement about David being badly injured was not the functional equivalent of interrogation—the officers could not have reasonably known that statement would prompt defendant to volunteer incriminating statements about the incident. Under the circumstances here, Barrier's few followup questions about defendant's volunteered statements were neutral, clarifying questions about what defendant had already freely offered. No prewarning interrogation occurred, and *Miranda* was not violated. The *Miranda* warning administered 13 minutes into the recording was not a mid-interrogation warning—it was administered before interrogation began. The federal Supreme Court's decision in *Seibert*, *supra*, 542 U.S. at pages 604, 617 (plur. opn. of Souter, J.), regarding mid-interrogation warnings is not applicable and we do not reach defendant's arguments in this regard.

22.

**II.	Use of Prior Convictions as Evidence of Defendant's Character for Violence**

Defendant argues that, despite the court's pretrial ruling that three of defendant's prior convictions were admissible for purposes of impeachment, the prosecutor introduced prior convictions that far exceeded the scope of the court's ruling and used them for an impermissible purpose—to argue defendant's character for violence.

**A.	Background**

**1.	Pretrial Order Regarding Use of Defendant's Prior Convictions**

Both the prosecution and defense counsel filed pretrial motions regarding the use of defendant's prior convictions, which included several misdemeanor and felony convictions for corporal injury to a spouse or cohabitant (§ 273.5). Of the 11 prior convictions identified by the prosecutor, the court ruled only three were admissible, so long as they were not referred to as crimes of assaultive behavior.

"Count 1 is elder abuse. [¶] So the fact that the defendant has—10 of his 11 convictions here have to do with some type of either spousal abuse or some type of assaultive behavior, we would have to be careful how we would coin that. We'd have to sanitize those.

"For example, he has a conviction [in] April of this year for a [battery against cohabitant/spouse/dating partner]. That's a little too close to home for the charges here. So that would have to be sanitized. [¶] … [¶] [S]ince we have so many convictions that are assaultive behavior, like the one we have here, we run into the problem of probative value versus prejudicial effect on the jury. [¶] So I'm reluctant to have the jury hear that he's constantly been convicted of assaultive-type behavior. So we run into the position of where we have to pick and choose which ones in the last ten years that would be probative, yet not too prejudicial to the defense."

The court ruled that if defendant testified, the prosecution could impeach him with the 2013 section 273.5 felony conviction; the 2012 section 273.5 misdemeanor conviction; and a 2008 misdemeanor section 422 conviction. However, the convictions

23.

under section 273.5 were to be "sanitized" and the jury was to be told those were "crimes of moral turpitude."

## 2. Unsolicited Testimony of Victim's Violent Character

During trial, Maria testified for the prosecution, and she was asked during cross-examination about David's drinking habits. Maria testified that when David lived with her in the past, she had witnessed him drinking excessively and that he would fall down from intoxication at times. On redirect, the prosecutor asked Maria why she believed David's behavior on the day of the incident was due to intoxication rather than from being beaten. Maria testified it was because "he gets belligerent when he's drinking" and "he likes to fight when he's drunk."

At the end of that day's testimony, the prosecutor asked that Maria's testimony on redirect that the victim was a "violent, belligerent drunk" be stricken as "improper character evidence that would then allow [her] to get into [defendant's] violent character." Defense counsel argued the prosecutor had failed to make a timely objection to Maria's testimony, but it was also not defendant who had brought up how David had acted in the past when he drank. Defense counsel maintained she did not plan to open the door to David's violent character because, as discussed at the motions in limine hearing, if the defense opened the door to the victim's character for violence, then the People would be entitled to admit evidence of defendant's character for violence. Because Maria's testimony was not solicited by the defense, defense counsel argued that door had not been opened by defendant.

The trial court observed Maria's testimony in this regard was unsolicited. The court ruled that once they were finished with the medical testimony, and if defendant took the stand, the court would "revisit" the issue: "As I said, based on how direct exam goes with [defense counsel], the issue might be moot. If it is not, [defense counsel] didn't broach it. I will talk with you at sidebar and we can determine how we're going to proceed at that time."

24.

Defendant took the stand the next day, but the trial court did not revisit the issue on the record. During defendant's cross-examination, the prosecutor asked a series of questions about statements defendant made about David during a police interview. The prosecutor introduced defendant's statement to police the victim did not act like he was 65 years old, he acted like he was 30 years old, and that he was in the military. Defendant acknowledged he made that statement and testified David was capable of causing injuries; defendant made unsolicited comments in his cross-examination that David was known to carry a knife and was a "violent drunk."

### 3. Use of Defendant's Prior Convictions on Cross-examination

After defendant made statements on cross-examination about David's character for violence, the prosecutor asked whether defendant had told police he did not have "a history of beating people up." When defendant confirmed that is what he said, the prosecutor asked, "That was a lie, wasn't it?" Defense counsel asked the court for a moment to speak with the prosecutor, and the prosecutor requested a brief sidebar conference. The court ordered a recess and excused the jury temporarily. Nothing about this sidebar was placed on the record.

When proceedings resumed, the prosecutor repeated the question whether defendant had "a history of beating people up," and defendant responded he had "domestic violence" on his record. The prosecutor then questioned defendant about five prior convictions for "spousal abuse" from 2005 to 2018—far exceeding the bounds of the court's pretrial ruling regarding use of the prior conviction for impeachment purposes. The record contains no objection to the prosecutor's introduction of these prior convictions as improper character evidence or as outside the court's pretrial ruling.

### B. Standard of Review

Rulings on the admissibility of evidence are reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724–725.) The admission of evidence violates a defendant's federal due process rights if it renders the trial fundamentally unfair. (See

25.

*Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.*"]; *People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20.)  Otherwise, the erroneous admission of evidence violates only state law and is reviewed for prejudice under the standard established in *People v. Watson* (1956) 46 Cal.2d 818, 836, requiring reversal only if it is reasonably probable that the defendant would have obtained a more favorable result had the evidence been excluded.

### C.  Analysis

"'As a general rule, evidence that is otherwise admissible may be introduced to prove a person's character or character trait.  ([Evid. Code,] § 1100.)  But, except for purposes of impeachment (see [Evid. Code,] § 1101, subd. (c)), such evidence is inadmissible when offered by the opposing party to prove the defendant's conduct on a specified occasion ([Evid. Code,] § 1101, subd. (a)), unless it involves commission of a crime, civil wrong or other act and is relevant to prove some fact (e.g., motive, intent, plan, identity) other than a disposition to commit such an act ([Evid. Code,] § 1101, subd. (b)).'"  (*People v. Fuiava* (2012) 53 Cal.4th 622, 695, italics omitted.)

There are several exceptions to this rule, however.  Pursuant to Evidence Code section 1103, in a criminal action, the defendant is permitted to offer evidence of the victim's "character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)" (*id.*, subd. (a)) in order "to prove conduct of the victim in conformity with the character or trait of character" (*id.*, subd. (a)(1)).  Relevant here, if defendant offers evidence the victim had a character for violence or a trait of character tending to show violence, the prosecution is permitted to show evidence of the *defendant's* "character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)" "to prove conduct of the defendant in conformity with the character or trait of

character ….'' (Evid. Code, § 1103, subd. (b) (Evidence Code section 1103(b) or Evid. Code, § 1103(b)).) Thus, if a defendant offers evidence to establish the victim was a violent person, which invites the jury to infer the victim acted violently during the events in question, the prosecution is permitted to introduce evidence the victim was not a violent person *and* the defendant was a violent person, so the jury might infer it was *the defendant* who acted violently. (*People v. Fuiava*, *supra*, 53 Cal.4th at pp. 695–696.)

### 1.    Forfeiture

Defendant argues he did not elicit evidence of the victim's propensity for violence when drinking—that evidence was introduced by the prosecution through Maria. And, because defendant did not open the door for the prosecutor to introduce evidence of defendant's propensity for violence, it was an abuse of discretion for the trial court to allow the prosecutor to admit defendant's prior convictions beyond those approved for impeachment purposes, use the term "domestic violence" in describing them, and engage in explicit propensity reasoning. Moreover, defendant argues, even when character evidence is admissible, it is subject to the balancing test under Evidence Code section 352. Here, the court failed to balance the prejudicial effect of these prior convictions under section 352, which rendered the trial fundamentally unfair and violated defendant's due process rights.

The People argue defendant forfeited his claim because he never once objected at trial to admission of his prior convictions as impermissible character evidence or that their admission was unduly prejudicial under Evidence Code section 352. Although the court had ruled the use of three prior convictions for impeachment was permissible so long as "sanitized," the People argue that defendant was required to make a renewed objection to give the trial court an opportunity to consider whether the circumstances had changed—i.e., that defendant had presented evidence of the victim's character for violence. The People point out defendant also did not object to the prosecutor's argument in closing about defendant's character for violence.

27.

Defendant responds that defense counsel objected to the use of his prior convictions to show propensity for violence at the pretrial hearing on the parties' motions in limine and when the prosecutor urged the court to strike Maria's testimony about the victim's propensity for violence when intoxicated. Defendant concedes that, although the sidebar conference is unfortunately missing, objection to the use of these priors as character evidence was made and the issue was preserved for appeal.

We conclude this claim was not properly preserved and is forfeited for purposes of appeal. It is unfortunate the sidebar conference was not recorded or memorialized for the record. Defense counsel expressly sought a ruling prior to trial that all trial court proceedings be recorded, which the court granted except with respect to the sidebar conferences. While defendant was entitled to a recording of sidebar conferences upon request (Code Civ. Proc. § 269, subd. (a)(2)), it was not clear defense counsel's motion explicitly related to sidebar conferences. Moreover, defense counsel did not object to this limitation on recording.[3]

But forfeiture does not rest solely or even primarily on the fact that a seemingly important sidebar conference was not recorded or memorialized. The risk of opening the door to evidence of defendant's violent character was well known to both parties—they discussed this issue at the pretrial hearing on the parties' in limine motions and after the prosecutor's witness gave unsolicited testimony on direct examination related to the victim's character for violence when intoxicated. The parties knew defendant's anticipated testimony might open the door to character evidence, and the court had reserved ruling on this issue for that very reason. But when the prosecutor sought to

---

[3] Code of Civil Procedure section 269, subdivision (a), provides that "[a]n official reporter … of the superior court shall take down in shorthand all testimony, objections made, rulings of the court, exceptions taken …. [¶] … [¶] (2) [i]n a felony case, on the order of the court or at the request of the prosecution, the defendant, or the attorney for the defendant." (See *People v. Manson* (1976) 61 Cal.App.3d 102, 214 ["In the absence of request that a record be made of a conference between court and counsel, none is required."].)

admit the prior conviction evidence as character evidence, there was no objection—only the unrecorded sidebar. There is also no question the prior convictions were offered as character evidence and not just for impeachment—this fact is reflected by the questioning itself and the prosecutor argued as much in closing.

Given the timing of the sidebar and defense counsel's failure to object to the admission of the prior convictions as character evidence, it seems likely the issue was addressed at the sidebar conference. Yet the record contains no objection on an anticipated and contested evidentiary issue on which the court had reserved ruling—all that is noted is an unrecorded sidebar conference was held on an unspecified topic, and no summary of that conference was provided by the court or the parties after it concluded despite that the jury was not in the courtroom.

Under these circumstances, defendant was required to press for a ruling when the prosecutor sought to offer the prior conviction evidence to show defendant's character, and a renewed objection to its use as character evidence was necessary to preserve the issue for appeal. (Evid. Code, § 353; see *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [ruling on admissibility of evidence reserved in anticipation of trial testimony required counsel to press for a ruling at the time the evidence was admitted and object to the evidence until he obtained a ruling].)

### 2.     No Error on the Merits

Even if we were to reach the merits, however, we would be unable to conclude the trial court abused its discretion in admitting prior convictions as evidence of defendant's character. The parties were well aware that if defendant opened the door to the *victim's* character for violence, then the prosecutor was entitled to offer evidence of *defendant's* character for violence under Evidence Code section 1103(b), which included prior felony and misdemeanor convictions related to corporal injury to a cohabitant/spouse/dating partner.

In nonresponsive answers to some of the prosecutor's questions in cross-examination, defendant gave unsolicited opinion testimony the victim had a character for violence.  The defense theory was that defendant hit David in self-defense when David, who was intoxicated, swung first at defendant.  In questioning defendant on his self-defense testimony and similar prior statements to police officers, the prosecutor asked the following series of questions:

> "[PROSECUTOR:]  You could have gotten away from [the victim] when he swung at you; isn't that true?
>
> "[DEFENDANT:]  I do not know.
>
> "[PROSECUTOR:]  Did you try?
>
> "[DEFENDANT:]  It happened so fast.
>
> "[PROSECUTOR:]  Did you try?
>
> "[DEFENDANT:]  I avoided it, yes, I did, but it was natural instinct.
>
> "[PROSECUTOR:]  Your automatic reaction was just to hit him in the face?
>
> "[DEFENDANT:]  To defend myself.  This man is known to carry a knife."

A few minutes later, the prosecutor introduced statements defendant made during his police interview to the effect defendant felt he had to defend himself from the victim because the victim had been in the military, but also that the victim was extremely intoxicated to the point he was falling down.

> "[PROSECUTOR:]  So once you described how intoxicated he is and the officers bring up his age, you indicate that he is physical, he's in the military, he's in the Army.  The officers confront you with the fact that you can't really have it both ways.  Either he's a falling-down drunk, like you said the first time, or he's capable of taking care of himself and is a physical imposition to you.  [¶]  Correct?
>
> "[DEFENDANT:]  He doesn't stop.

30.

"[PROSECUTOR:] You can't have it both ways; right?

"[DEFENDANT:] I don't know how you would consider—every person reacts different to alcohol.

"[PROSECUTOR:] What was he? Was he a falling-down drunk, like you said, or was he this military, physical Army man?

"[DEFENDANT:] He was a fallen-down drunk because he kept getting back up.

"[PROSECUTOR:] There was no need to punch him in the face; correct?

"[DEFENDANT:] No, that's not correct.

"[PROSECUTOR:] Okay. Thank you. [⁋] You go on to describe him. The officer asks you—Page 12 as well, Line 14. The officer says, 'So at this point he's like this super-military guy,' and your response is 'Yeah. It just came out of him, like "rawr." It just came out of him.'

"[DEFENDANT:] No. You're emphasizing these words like I was talking like I was gung-ho. I was not talking gung-ho like that.

"[PROSECUTOR:] Do the words change? Is that what you said?

"[DEFENDANT:] The way you're saying it—you're saying it like after this guy beat him up—this is my uncle, for crying out loud.

"[PROSECUTOR:] Did you say the words that I just read?

"[DEFENDANT:] I told the officers like 'roar,' like anger was coming out of him. You're emphasizing like I was over there gung-ho and beat this poor man up.

"[PROSECUTOR:] They asked you if he was like a super-military guy and your response was 'yeah.'

"[DEFENDANT:] *He was [a] violent drunk*.

"[PROSECUTOR:] Super military guy?

"[DEFENDANT:] *Not the military, but a violent drunk. I do know he's violent*." (Italics added.)

Testimony about the victim's character for violence was introduced, and the defense highlighted this testimony in closing arguments noting David's character for violence in aid of its theory defendant was acting in self-defense—"[defendant] believes that [David] starts fights when he's drunk, and that is corroborated by [David's] own sister. She said, '[h]e's a belligerent drunk and he starts fights when he's drunk,' and that's what he did here. That's what [defendant] believed. That's what he knew. That's what happened. That gives rise to his actions." The question was whether *defendant* had introduced this evidence, triggering the exception for introduction of defendant's character for violence. (Evid. Code, § 1103(b).)

The prosecution cannot "knock[] down a straw man of its own making" by eliciting testimony from the defendant about the victim's character for violence in order to offer evidence of [the] defendant's character for violence. (See *People v. Hall* (2018) 23 Cal.App.5th 576, 592 [Evid. Code, § 1102 allows the prosecution to present relevant opinion evidence regarding a defendant's character, but *only* when the defendant has first offered evidence placing his character at issue].) Whether or not Maria's redirect testimony was unsolicited and could not be fairly attributable to defendant, on cross-examination defendant volunteered unsolicited testimony about the victim's violent character when intoxicated—not just the fact David was violent that day—and that he was known to carry a knife. Defense counsel expressly made use of defendant's testimony in this regard in closing arguments on the issue of self-defense—defendant's testimony was clearly understood to be a statement of David's character for violence while intoxicated of which defendant was aware.

In combatting the theory defendant was acting in self-defense when he struck the victim, on cross-examination the prosecutor explored the seeming inconsistency in defendant's statements to police that the victim was former military—implying he was a legitimate threat in terms of prior training and physical capability when the victim purportedly took the first swing at defendant—but also that the victim was so inebriated

he was falling down, hitting his head and injuring himself. The fact David was in the military had nothing to do with his character for violence—the prosecutor's questions about that statement were not eliciting any testimony about David's violent character. Rather, defendant's repeated statements the victim was violent and a violent drunk were nonresponsive to the prosecutor's questions and unsolicited. Defendant opened the door to evidence of his own character for violence.

If this type of unsolicited opinion testimony by a defendant does *not* open the door simply because it was volunteered on cross-examination, a defendant would be able to offer unsolicited testimony about the victim's character for violence without a way for the prosecutor to respond. This would create an unfair and technical loophole that sidesteps the exception for character evidence admissible under Evidence Code section 1103(b).

Defendant argues that if prior convictions were admissible as character evidence, the trial court failed to consider whether those convictions were unduly prejudicial under Evidence Code section 352 and the failure to do so violated his due process rights. But, no objection was made on this ground either, and we have no idea what was decided or discussed at the sidebar conference immediately before the admission of these prior convictions. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 21, & fn. 5 [failure to interpose objection to "'propensity'" evidence forfeited claim its admission violated constitutional due process rights].) Beyond that, we cannot conclude it was necessarily an abuse of discretion to admit these prior convictions under Evidence Code section 352 when used as character evidence pursuant to Evidence Code section 1103(b). Not all of defendant's prior convictions were admitted—four prior convictions under section 273.5 between 1993 and 1998 were not offered. None of the circumstances or facts surrounding the prior convictions were admitted, the offered convictions were not unduly remote in time—dating back to 2005, and they were probative of defendant's assaultive misconduct in household and domestic relationships.

33.

In sum, defendant's claim his prior convictions were impermissibly offered as character evidence is forfeited. Even were we to consider the merits, we could not conclude it was an abuse of discretion to admit the prior convictions as character evidence.

## III. Prosecutorial Misconduct

Defendant contends the prosecutor engaged in acts of misconduct that involved a pattern of argumentative questions in defendant's cross-examination; referred to facts not in evidence; denigrated defendant before the jury; and cast aspersions on defense counsel.

The People maintain most of these claims of misconduct were forfeited because no jury admonition was requested, and, even if it had been, no prejudice can be shown. As to claims of misconduct that were not forfeited, the People maintain there was no prejudicial misconduct.

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.""" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

### A. Argumentative Questioning

Defendant argues the prosecutor engaged in a pattern of argumentative questioning of defendant during his cross examination. Defendant points to five instances where defense counsel's argumentative objections were sustained, four instances of other argumentative questions (an objection was interposed as to three of

these), and an instance where an objection to an argumentative question was sustained but the prosecutor nonetheless referred to it during closing arguments. Defendant maintains the cumulative effect of this improper questioning was to deny defendant a fair trial.

### 1. Background

**Challenge No. 1**: The prosecutor cross-examined defendant about his statements to police that David was a "'soldier'" and a "'killer'" and that David was so intoxicated he kept falling down every time he stood up:

> "[PROSECUTOR:] So we've got crazy, military, aggressive, capable, functioning man and we've got someone who can't take three steps without falling down, and every time he gets up he falls. [¶] Sir, which is it?
>
> "[DEFENDANT:] Mix them both, you get a violent man.
>
> "[PROSECUTOR:] Mix of both? Is it because that's what's convenient for your story here?
>
> "[DEFENDANT:] No, it's not convenient. That's what happened that night.
>
> "[PROSECUTOR:] Didn't you even tell the officer that it sounded impossible, that what you were saying sounded impossible?
>
> "[DEFENDANT:] Yeah. I don't know how somebody could drink so much and still survive and breathe.
>
> "[PROSECUTOR:] ***You let them know, 'Hey, I get that my story sounds ridiculous;' right?***
>
> "[DEFENSE COUNSEL:]: Objection. Argumentative.
>
> "THE COURT: Sustained." (Boldface and italics added.)

**Challenge No. 2**: The prosecutor asked defendant about his statements that David falling in the yard was comical:

"[PROSECUTOR:] Didn't at one point you describe watching [the victim fall down repeatedly] to the officers as being rather comical? [¶] … [¶]

"[DEFENDANT:] I said it was almost comical. And the way I emphasized it, the way I said it right now, it was almost comical, is the way I said it like that.

"[PROSECUTOR:] Funny? Comical?

"[DEFENDANT:] Maybe it's the wrong word I used.

"[PROSECUTOR:] That['s] what you said, though, isn't it?

"[DEFENDANT:] I talk in figure of speech.

"[PROSECUTOR:] *What kind of figure of speech was it when you called him a prick?*

"[DEFENSE COUNSEL:] Objection. Argumentative. [¶] … [¶]

"THE COURT: Overruled." (Boldface and italics added.

**Challenge No. 3**: The prosecutor also questioned defendant whether he told the officers he was not going to call 911 for David because David was a "prick."

"[PROSECUTOR:] So sir, when you were asked, 'So you didn't'— 'don't you think you should call medical aid for somebody like that,' you said, 'I'm not calling for this prick;' right?

"[DEFENDANT:] I did not say it that way.

"[PROSECUTOR:] Did you say the words?

"[DEFENDANT:] I said the words, yes.

"[PROSECUTOR:] *Did you say 'prick' lovingly?*

"[DEFENDANT:] I said, 'I'm not calling for this prick' the same way I'm talking to the officer." (Italics added.)

No objection was interposed.

**Challenge No. 4**: After asking defendant about his prior convictions for corporal injury to a spouse, the following exchange occurred:

"[PROSECUTOR:]  So sir, fair to say that when you said, 'I don't have a history of beating people up,' it was a lie?

"[DEFENDANT:]  It's not a lie, but it's with the same person and it's not going around in public.

"[PROSECUTOR:]  ***Does it not count if you beat up your wife or girlfriend seven times*?**

"[DEFENSE COUNSEL]:  Objection. Argumentative.

"THE COURT:  Sustained.  Rephrase."  (Boldface and italics omitted.)

**Challenge No. 5**:  In questioning about defendant's prior convictions, the following exchange occurred:

"[PROSECUTOR:]  Those charges are false?

"[DEFENDANT:]  No.  Two of those charges are—I admit to them. And the other ones, it was self-convicted charges to—just to get out of jail and get back to work.

"[PROSECUTOR:]  Technically you admitted to all of them; correct?

"[DEFENDANT:]  That's the only way out of the system, isn't it?

"[PROSECUTOR:]  ***Or to stop beating your wife.***

"[DEFENSE COUNSEL]:  Objection.  Argumentative.

"THE COURT:  Sustained."  (Boldface and italics omitted.)

**Challenges Nos. 6 and 7**:  In further questioning regarding defendant's prior convictions, the following exchange occurred:

"[PROSECUTOR:]  Fair to say to say you like to pick on people that aren't quite as physically capable as you?

"[DEFENSE COUNSEL]:  Objection.  Argumentative.

"THE COURT:  Overruled.  You can answer.

"[DEFENDANT:]  No.

37.

"[PROSECUTOR:]  No, you don't think your wife is as physically capable as you are?

"[DEFENDANT:]  How do I answer this question?

"[PROSECUTOR:]  Truthfully, please.

"[DEFENSE COUNSEL]:  Objection.  Argumentative.

"THE COURT:  Sustained."

**Challenges Nos. 8 and 9:**  In recross-examination, the prosecutor asked about the blood at the scene defendant had described to the police:

"[PROSECUTOR:]  And then again, you told law enforcement [David] was landing on his head everywhere and you might still see blood all over the woodwork; right?

"[DEFENDANT:]  Right.  [¶] … [¶]

"[PROSECUTOR:]  So there's blood all over the woodwork?

"[DEFENDANT:]  It turns out there wasn't.  It was nighttime.  It was just the color of the wood.  It looks like blood, but it wasn't blood.

"[PROSECUTOR:]  Then again on Page 26, you told law enforcement he had a lot of blood coming out.  'I said'—'when he hit his head, I was like, Oh, my God.'

"[DEFENDANT:]  That came from his mouth.

"[PROSECUTOR:]  A lot of blood?

"[DEFENDANT:]  Enough for me to say it's a lot, what came out.

"[PROSECUTOR:]  *Were you lying then or are you lying today?*

"[DEFENSE COUNSEL]:  Objection.  Argumentative.

"THE COURT:  As phrased, sustained.

"[PROSECUTOR:]  Sir, which is it?  Was there a lot of blood or not?

"[DEFENDANT:]  No.

"[PROSECUTOR:]  Then you lied to the officers?

"[DEFENDANT:]  Again, figure of speech.  There was blood.  When I said a lot, at that time it made it seem like a lot, but it was just blood.

"[PROSECUTOR:]   … [¶] ***When you say you use figures of speech, do you mean you use false statements?***

"[DEFENDANT:]  No.

"[DEFENSE COUNSEL]:  Objection.  Argumentative.

"THE COURT:  Overruled.  You can answer.

"[DEFENDANT:]  No."  (Boldface and italics added.)

**Challenge No. 10:**

In closing arguments, the prosecutor referred to a question and answer to which the trial court had sustained an objection:

"Ladies and gentlemen, the most telling point of cross-examination to show you that this defendant has done nothing but lie to you this entire time is when I asked him a question and he literally looked at his attorney and asked, 'How do you want me to respond to that?' [¶]  Remember when I threw my hands down on the podium and I said, 'Truthfully.  That's how I want you to respond.'  He literally didn't know what other lie to tell next, and he looks over and says, 'How do I answer that?'  [¶]  What do you want me to stay to that?  [¶]  That's how you know everything that came out of his mouth was concocted."

### 2.     Analysis

Argumentative questioning is "a tactic of posing queries that are not actually addressed to the witness, to which answers are not really expected, and that may in fact be unanswerable, as a device to insinuate facts not in evidence, or to make a speech to the jury."  (*People v. Shazier* (2014) 60 Cal.4th 109, 141–142.)

39.

### a. Forfeiture of Misconduct Claim Where Objections Were Sustained and No Admonition Requested or Where No Objection Was Interposed

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct on appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." (*People v. Williams* (1997) 16 Cal.4th 153, 254.) "When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal." (*People v. Morales* (2001) 25 Cal.4th 34, 43–44.)

"'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if "'an admonition would not have cured the harm caused by the misconduct.'" [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.""' (*People v. Seumanu*, *supra*, 61 Cal.4th at pp. 1328–1329.)

With respect to challenges Nos. 1, 4, 5, 7 and 8 above, the trial court *sustained* defense counsel's objections, and defense counsel did not ask for any additional admonition to cure any potential prejudice from the prosecutor having asked these questions. Defense counsel was required to request an admonition to preserve a claim of prosecutorial misconduct on appeal. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1241 ["A claim of prosecutorial misconduct is not preserved unless the defendant makes a *timely* objection *and* requests an admonition, and even then the issue is preserved *only if*

40.

the admonition was insufficient to cure any harm."], overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Because defense counsel did not request admonitions when objections were sustained, we conclude defendant's claim based on those alleged acts of misconduct is forfeited. (*People v. Hajek and Vo*, *supra*, at p. 1241.) Further, with respect to challenge 3 above, no objection was interposed at all.

The futility exception to forfeiture does not save defendant's claim of misconduct as to statements where no objection or no request for an admonition was made. This exception applies in "unusual" or extreme circumstances such as those in *People v. Hill* (1998) 17 Cal.4th 800, 821, where defense counsel's failure to object was excused by the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, [which] created a trial atmosphere so poisonous" that further objections "would have been futile and counterproductive" to the defendant. (*Ibid.*) No circumstances so "unusual" existed here. Moreover, the trial court willingly sustained objections to argumentative questions several times—neither objecting nor seeking an admonition were futile.

### b. Overruled Argumentative Objections

The questions to which objections were overruled in challenges Nos. 2, 6, and 9 do not constitute prosecutorial misconduct.

The prosecutor questioned defendant about several things he told the police. Defendant told officers that when David was trying to hit him, defendant was no longer hitting him back—all defendant did was "'hold him down.'" Defendant attempted to clarify that he was holding David down with a water hose by splashing it in his face, trying to "sober him up." When the prosecutor clarified whether he actually held David down as he told police, defendant responded that this was a "figure of speech." Then, in asking defendant whether he had referred to David's continued falling as "comical," defendant said that was the word he used, but his emphasis was different. When the prosecutor pressed him on whether that was the precise word he used, defendant again

41.

said he "talk[s] in figure[s] of speech." The prosecutor then asked, "What kind of figure of speech was it when you called him a prick?," to which an objection was overruled. The prosecutor confirmed defendant used that word and asked whether he meant it.

Given that defendant was attempting to walk back the expressions he used when talking with police as mere "figure[s] of speech," the prosecutor was legitimately seeking an answer about what he meant when he called the victim a "prick," as evidenced by the followup questions. Although the question was phrased argumentatively, the prosecutor was seeking relevant testimony about whether defendant had told officers he refused to call 911 for David because David was being a "prick."

The same applies to the prosecutor's question whether by saying he used "figures of speech" defendant meant false statements and whether he liked to pick on people who were not as physically capable. It was legitimate for the prosecutor to clarify defendant's attempts to soften the words he used in discussing the victim with the police—this was relevant to defendant's credibility and whether defendant struck David in anger over what David was saying to him rather than in self-defense. As for picking on people less capable than him, even to the extent the question was improperly argumentative, it was aimed at the evidence of defendant's character for violence to which no objection had been made and the door had been opened. These questions did not state or imply the existence of facts not in evidence otherwise before the jury, they were answerable, and the questions were not about irrelevant matters. None were so egregious that they infected the trial with such unfairness as to deny defendant due process, and they did not constitute a deceptive or reprehensible method to attempt to persuade the jury. (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

Finally, as to challenge 10, the prosecutor's reference in closing argument to a question that had been objected to and sustained has been forfeited. Defense counsel made no objection to the prosecutor's argument in this regard. Even assuming a misconduct claim was not forfeited, the reference was not prejudicial. As already noted,

42.

the jury was instructed the attorney's arguments were not evidence, and they were to disregard any question during the trial to which an objection had been sustained.

### c.    Cumulative Effect

Defendant argues we should consider all of the argumentative questions to evaluate the overall pattern of impropriety. Defendant cites *People v. Estrada* (1998) 63 Cal.App.4th 1090, 1100 (*Estrada*), for the proposition that unobjected-to misconduct can be evaluated as part of a pattern. *Estrada* is clearly distinguishable, however. That case presented an extreme series of misconduct by a codefendant's counsel that was so egregious the entire trial was infected from beginning to end. There were at least two motions for a mistrial based on the attorney's misconduct before opening statements even concluded. (*Id.*at pp. 1097–1098.) Counsel repeatedly violated the court's orders not to reference the defendant's prior arrest; referred to facts not in evidence; used the defendant's "sacrosanct invocation of his right to silence" as a device to bolster his argument the defendant was a lying drug dealer; posed a question that suggested the defendant's own lawyer thought the defendant was guilty; improperly used the defendant's two prior convictions to show the defendant's propensity to commit the crimes; and made comments in argument that the defendant's attorney believed the defendant had committed perjury. (*Id.* at pp. 1103, 1105–1106.)

The court observed it had "never seen a display of misconduct rivaling that of [counsel for the codefendant]" in that case. (*Estrada*, *supra*, 63 Cal.App.4th. at p. 1106.) While some of the misconduct was not objected to, the court found it proper to consider it all to evaluate the overall pattern of impropriety counsel displayed. (*Id.* at p. 1100.) Here, nothing about the prosecutor's argumentative questions—to which most objections were sustained, a few were overruled, and one was not objected to at all—either by themselves or in conjunction approached the situation in *Estrada*.

Considering all of the argumentative questions together, whether or not objections were sustained, the "critical inquiry on appeal is not how many times the prosecutor erred

43.

but whether the prosecutor's errors rendered the trial fundamentally unfair or constituted … reprehensible methods to attempt to persuade the jury." (*People v. Hinton* (2006) 37 Cal.4th 839, 864.) While the prosecutor should have refrained from asking argumentative questions, the questions here did not met either standard. (See *People v. Peoples* (2016) 62 Cal.4th 718, 794 [prosecutor's argumentative questions did not meet misconduct standard].)

### B. Reference to Facts Not in Evidence During Closing Argument

### 1. Picking on Victims When No One Else is Around

Defendant argues the prosecutor improperly commented during closing argument that defendant "picks on vulnerable victims *when no one else is around*." (Italics added.) Defendant maintains the fact no one else was around was unsupported by the evidence given that he testified his neighbors were present at the time of the incident. The People point out this was merely defendant's version of events. It was the prosecution's theory defendant fabricated his story about the neighbors and no one else was there to witness the altercation. The People maintain there was a reasonable inference to draw from the fact the neighbors did not testify, and the prosecutor was entitled to comment on it.

In his reply brief, defendant responds the prosecutor was referring also to defendant's prior convictions and implying no one was around when those crimes were committed; there was no evidence to make that statement or draw such an inference.

A prosecutor is given wide latitude during argument. The argument may be "vigorous" as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.) Nevertheless, mischaracterizing the evidence is misconduct. (*Id.* at p. 823.) So is referring to facts not in evidence. "'Statements of supposed facts not in evidence … are a highly prejudicial form of misconduct, and a frequent basis for reversal.'" (*Id*. at p. 828.)

We agree with the People that, insofar as the prosecutor commented on the absence of any witnesses during the altercation with David, it was not improper—that was a fair comment on the evidence and the inference that could be drawn from it, even to the extent it conflicted with defendant's testimony. However, the prosecutor's comments went well beyond inviting the jury to draw that inference alone. The prosecutor argued, "Unfortunately, in this situation, there were no other witnesses around, Okay? [⁋] That is typical with this defendant, given his history. This man picks on vulnerable victims when no one else is around." Defendant objected the statement assumed facts not in evidence, which was overruled. The prosecutor continued: "That's what spousal abuse is all about … [t]hose are the types of crimes, like elder abuse, that are committed when nobody else is around. They wait for the opportunity to pick on the most vulnerable people that they can find, and then they put them in the hospital, like [David]."

No underlying facts about defendant's prior convictions were admitted other than they involved domestic violence against a spouse or cohabitant. Given that, the prosecutor's argument referred to facts not in evidence. However, whether considered under the state's "'reasonable likelihood of a more favorable verdict'" standard or the federal "'harmless beyond a reasonable doubt'" standard, this error was harmless. (*People v. Rivera* (2019) 7 Cal.5th 306, 334.) This was an isolated instance of referring to facts not in evidence during the closing argument. Other than this comment, the fact of defendant's prior convictions for spousal abuse had been admitted into evidence, and the prosecutor's other comments regarding the prior convictions were focused on that admitted evidence. The jury was instructed to determine the facts from the evidence received at trial and not from any other source and that statements made by the attorneys during the trial were not evidence.

Further, the evidence was quite strong in favor of defendant's guilt regardless of this statement about his prior acts. He admitted striking David twice, and his testimony

45.

was riddled with inconsistencies about whether David really presented a threat given David's purported state of intoxication and the manner in which events unfolded. Defendant did not call 911 for David, although he said he saw David hit his head repeatedly; despite David's injuries there was evidence defendant sprayed him with a water hose in an effort to sober him; defendant called Maria to tell her he "beat the fuck" out of David, there was evidence he told Maria to lie to the 911 dispatcher about his presence at the house, and he left the scene before police arrived. Although Maria denied it, Moore testified she told him she arrived at the house, she found David lying on the ground in the backyard and defendant was spraying him with the hose, which contradicted defendant's testimony he helped David into the house. There was overwhelming evidence of defendant's guilt, even in the absence of the prosecutor's reference to a fact not in evidence about defendant's prior convictions.

For these reasons, we conclude the prosecutor's reference to this fact not in evidence was harmless under either state or federal prejudicial error standards.

### 2.       Arguing the Neighbors Did Not See Anything

Defendant argues the prosecutor postulated that if the neighbors had been called as witnesses they would have said they did not see anything, but that is not what the prosecutor said. Rather, the prosecutor argued, "you better believe that if Audrey or Laverne [T.] saw the victim beating himself, as the defendant wants you to believe, they would have been up here testifying to it. No one calls witnesses to get up here and say, 'I didn't see anything.' That just wastes everyone's time. [¶]…[¶] … But what good does it do to put someone on the stand that says, 'I didn't see it. I have nothing to offer,' right? It just wastes everyone's time." The prosecutor was arguing these were relevant and logical witnesses for defense to call; the fact these witnesses did not testify implies they did not see anything because it would be useless to call a witness to testify they saw nothing. That was proper argument about the inferences that could be drawn. (*People v. Morales*, *supra*, 25 Cal.4th at p. 44 ["At closing argument a party is entitled both to

discuss the evidence and to comment on reasonable inferences that may be drawn therefrom."]; (*People v. Gomez* (2018) 6 Cal.5th 243, 299 [prosecutor may make "'comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses.'"].)

### 3.    Comment and Inference About the Victim's Vomiting

Defendant argues the prosecutor improperly commented on David vomiting in the ambulance.  Defense counsel argued the victim was vomiting from alcohol intoxication. The prosecutor argued that if, as defendant had testified, David was drinking every day to the point where he gets drunk, "you would think that, tolerance-wise, he wouldn't be throwing up every day."  This was not pure speculation as defendant argues.  This was a response to the inference defense counsel had asked the jury to make that David's intoxication caused the vomiting, while the prosecutor was arguing the inference was faulty because it was more likely due to his head injuries than intoxication given what defendant claimed were the victim's drinking habits.  It was up to the jury to determine the reasonableness of the inferences urged.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1208–1209.)

### 4.    Comment and Inference About Blood on Defendant's Shoes

Defendant maintains the prosecutor improperly argued the shoes defendant was wearing during the altercation would have had blood on them had they been recovered from defendant's mother's house.  In context, the prosecutor argued it would not have been helpful if the shoes had been recovered.  The prosecutor argued that if, for example, the shoes were recovered and found to have blood on them, the defense would argue the blood came from defendant's proximity to David after he fell multiple times and was bleeding; the prosecution would argue any blood on the shoes came from defendant kicking David in the head.  On the other hand, if the shoes were recovered without blood on them, the prosecutor hypothesized the defense would argue it showed David did not bleed that much from his injuries while the prosecution would argue defendant washed

them with a hose. The prosecutor argued the important inference to draw from the fact the shoes were not recovered was that defendant had changed his shoes before he left his mother's house that night; the prosecutor asked the jury to infer he changed his shoes because he knew they tied him to the crime. This was a fair comment on the evidence, asking the jury to draw an inference from the fact defendant had changed out of the shoes before he left the house.

### C.     Denigration of Defendant in Closing Argument

Defendant argues that while name-calling has been historically permitted by courts, the prosecutor's argument to the jury in closing calling defendant "disgusting" and a "monster" exceeded the bounds of fair argument.

There was no objection to these statements, but even assuming a claim of misconduct on this ground was not forfeited, on the merits we find the comments did not constitute misconduct. The prosecutor's comments were targeted at defendant's testimony that he had helped David get up the steps into the house and to the bathroom— evincing concern for David's welfare, yet when he talked with officers, he described David's falling as almost comical. The prosecutor called this discrepancy "disgusting." Near the end of the argument, the prosecutor described the severity of David's injuries and concluded defendant "had the nerve to tell the officers that it's comical and that [David] was a prick. What kind of monster does that?" The use of derogatory epithets to describe a defendant is not necessarily misconduct (*People v. Friend* (2009) 47 Cal.4th 1, 32), and here the references were isolated, were specifically directed to the evidence, and fit within the wide range of descriptive comments prosecutors are afforded, including epithets (*People v. Williams*, *supra*, 16 Cal.4th at p. 221).

### D.     Alleged Denigration of Defense Counsel

The prosecutor asked defendant whether he liked to "pick on people that aren't quite as physically capable as [defendant]." The objection was overruled, and defendant answered, "No." The prosecutor then countered, asking if defendant didn't think his wife

was as physically capable as he.  The defendant responded by asking, "How do I answer this question?"

In closing, the prosecutor made reference to this exchange, arguing it was a "telling point" that showed defendant had "done nothing but lie to [the jury] this entire time" because when the prosecutor had asked him a question, "he literally looked at his attorney and asked, 'How do you want me to respond to that?'"  The prosecutor concluded that this was "how you know everything that came out of his mouth was concocted."

Defendant argues this improperly impugned defense counsel and suggested she had assisted defendant in lying to the jury.  The People respond that this argument was forfeited because of a lack of objection, but even if considered on appeal, it was a broader argument about why the jury should not believe defendant.  The People note that when defense counsel responded to this argument, she said she did not think the prosecutor was making any implication that defendant was looking at defense counsel to give him the answer.

"Personal attacks on opposing counsel, including accusations that counsel fabricated a defense or misstated facts in order to deceive the jury, are forbidden." (*People v. Tate* (2010) 49 Cal.4th 635, 692–693.)  "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Dykes*  (2009) 46 Cal.4th 731, 771–772.)

We agree with the People this issue was forfeited by lack of an objection.  (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1339 [failure to object to misconduct in opening and closing argument forfeited claim on appeal].)  But even considered on its merits, we are

49.

not convinced the jury drew the damaging inference defendant suggests—that defendant's counsel was coaching him to deceive the jury. When defense counsel responded to this argument in her closing statement, she indicated she did not think the prosecutor was implying defendant was looking to her to give him the answer. Additionally, the other inference the prosecutor could have been asking the jury to draw was that defendant could not answer unexpected questions in a straightforward manner, suggesting that he only had answers to questions that fit within his version of what happened.

## IV.    Cumulative Error

Defendant claims the cumulative effect of these errors, even if harmless individually, was prejudicial. "A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Having concluded only that there was one error of misconduct, which was not prejudicial in itself, there is nothing to cumulate. As such, we necessarily reject defendant's claim of cumulative error resulting in prejudice. (*People v. Williams* (2013) 56 Cal.4th 165, 201, abrogated on other grounds in *People v. Elizalde*, *supra*, 61 Cal.4th at pp. 537–538 & fn. 9; *People v. Sedillo*, *supra*, at p. 1068.)

## V.     Senate Bill No. 136

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5(b) to limit application of prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5(b).) That amendment applies retroactively to all cases not yet final on Senate Bill No. 136's effective date. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342, citing *In re Estrada* (1965) 63 Cal.2d 740, 742.)

Here, the trial court imposed a one-year section 667.5(b) prior prison term enhancement for a term served for a conviction of inflicting corporal injury on a spouse or cohabitant (§ 273.5), which is not a sexually violent offense as defined in Welfare and

Institutions Code section 6600, subdivision (b).  On January 1, 2020, defendant's case was not yet final.

Therefore, as the parties agree, defendant is entitled to the ameliorative benefit of Senate Bill No. 136's amendment to section 667.5(b).  Defendant's prior prison term enhancement must therefore be stricken.

Where a portion of a sentence must be stricken, remand for "'a full resentencing as to all counts is [generally] appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'"  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  But remand is unnecessary where the trial court has imposed the maximum possible sentence.  (*People v. Lopez, supra*, 42 Cal.App.5th at p. 342.)

Here, the upper term was imposed on count 1 for elder abuse (§ 368), a three-year term was imposed for the GBI enhancement finding, and counts 2 and 3 were stayed pursuant to section 654.  Full resentencing is therefore unnecessary.

## VI.  *Dueñas* **Claim**

At the time of sentencing in August 2018, the trial court imposed the statutory minimum restitution fine of $300 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), suspended; a court operations assessment of $120 under section 1465.8; and a court facilities assessment of $90 under Government Code section 70373.  No objection based on defendant's inability to pay was interposed.  Pursuant to the Court of Appeal's subsequent decision in *Dueñas, supra*, 30 Cal.App.5th 1157, defendant requests we order remand for the trial court to conduct an ability-to-pay hearing so that it may amend the fines and fees as indicated by the information provided at that hearing.

For the reasons set forth in our recent decision in *People v. Montes*, we conclude the argument has not been forfeited and remand is appropriate so that an adequate record may be developed.  On remand, the trial court shall allow defendant to raise the issue of

51.

his ability to pay the fines and court assessments and to make a record on those issues. (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1111 (*Montes*).)

## A.    Forfeiture

As we recognized in *Montes*, "the failure to object in the trial court generally forfeits a claim on appeal and this principle is applicable to constitutional claims. (§ 1259; *People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.)  There are exceptions to this general rule, however, and courts of review have the discretion to consider an issue notwithstanding the failure to object. (*People v. McCullough*, *supra*, at p. 593; *In re Sheena K.*, *supra*, at pp. 887–888, fn.7.)" (*Montes*, *supra*, 59 Cal.App.5th at pp. 1117–1118.)

Relevant here, "[t]he restitution statute [expressly] provides that the inability to pay is not a 'compelling and extraordinary reason not to impose a restitution fine[]' (§ 1202.4, subd. (c)), but where … a trial court imposes a restitution fine *above* the statutory minimum, the court may consider the defendant's inability to pay in setting the fine (§ 1202.4, subd. (d))." (*Montes*, *supra*, 59 Cal.App.5th at p. 1118, italics added.) Because the trial court here imposed a minimum restitution fine of $300, defendant was precluded from objecting to the fine based on his inability to pay.  (*Ibid.*, citing § 1202.4, subd. (c).)

Additionally, "'[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence.' (*People v. Welch* (1993) 5 Cal.4th 228, 237; accord, *People v. Gomez*[, *supra*,] 6 Cal.5th [at pp. ]286–287; *People v. Black* (2007) 41 Cal.4th 799, 810.)" (*Montes*, *supra*, 59 Cal.App.5th at p. 1119.)  "In cases … involving the imposition of the statutory minimum restitution fine and mandatory court assessments, the decision in *Dueñas* constituted a marked departure from existing law" (*ibid*.), and "[g]iven the statutory language of section 1202.4 and the state of the substantive law prior to *Dueñas*, we conclude that defendant did not forfeit his *Dueñas* claim by failing to

object to the minimum restitution fine and court assessments in the trial court" (*id.* at p. 1121, accord, *People v. Son* (2020) 49 Cal.App.5th 565, 596–597; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031).

### B.     Remand Appropriate Due to Undeveloped Record

As explained in *Montes*, "[w]here, as in this case, a defendant advances a claim premised on a significant and unforeseeable development in the law that occurred after sentencing and during the pendency of the appeal; there was no statutory right to object to the restitution fine and court assessments at issue; and the record is wholly undeveloped on the issue, a limited remand is appropriate to allow the parties to address the issue in the trial court in the first instance." (*Montes*, *supra*, 59 Cal.App.5th at p. 1122.) "Discretion to determine an appropriate fine amount rests with the trial court and the court is free to consider, among other factors, any money received by a defendant, be it in the form of prison wages or gifts. (*People v. Potts* (2019) 6 Cal.5th 1012, 1055–1056 [concluding trial court could lawfully impose $10,000 restitution fine despite condemned inmate's categorical ineligibility to earn prison wages and his receipt of only occasional small gifts of money from family, and rejecting argument 'that a fine is automatically invalid if a defendant is unable to pay it'].)" (*Ibid*.)

### DISPOSITION

This matter is remanded to the trial court to allow defendant the opportunity to raise the issue of his ability to pay the fines and assessments imposed. The one-year prior prison term enhancement under section 667.5(b) is stricken. The trial court shall issue an amended abstract of judgment removing the prior prison term enhancement and reflecting any changes to the fines and assessments based on defendant's claim pursuant to *Duenas*,

*supra*, 30 Cal.App.5th 1157.  The trial court shall forward the amended abstract of judgment to the appropriate authorities.  The judgment is otherwise affirmed.


                                                                                  MEEHAN, J.

WE CONCUR:


LEVY, Acting P.J.


DESANTOS, J.